582 So.2d 258 (1991)
John A. WALKER
v.
BABCOCK INDUSTRIES, INC. and Lowery Brothers of Louisiana, Inc.
No. 90 CA 0125.
Court of Appeal of Louisiana, First Circuit.
May 16, 1991.
*259 Louis J. St. Martin and Estelle E. Mahoney, Houma, for plaintiffs and appellants, John A. and Mary E. Walker.
Louis Simon, II, Lafayette, for intervenor and appellant, McDermott Inc.
Christopher H. Riviere, Thibodaux, for defendant and appellee, Babcock Industries, Inc.
Before SAVOIE, CRAIN and FOIL, JJ.
CRAIN, Judge.
While employed as a rigger by McDermott Inc., John A. Walker was injured in the course and scope of his employment. Mr. Walker was operating a crane and was attempting to move a steel plate (which weighed approximately 7,200 pounds) from one area of the yard to another with the crane. The steel plate was attached to the boom of the crane by a chain sling. The chain sling was comprised of two chains which were permanently affixed together at one end which was attached to the boom. Each chain hung freely and each had a large hook at the opposite end. Each chain was separately wrapped around the steel plate. As Walker was "booming" the steel plate upward, one of the chains unwrapped. A few seconds later, the remaining chain suddenly broke, causing the load to fall on the cab of the crane, thereby injuring Walker. Walker received worker's compensation benefits for his injury.
The chain was manufactured by Babcock Industries, Inc. (Babcock). Mr. and Mrs. Walker instituted this products liability action against Babcock and Lowery Brothers of Louisiana, Inc. as manufacturers of the chain. Lowery Brothers was dismissed from the suit prior to trial. McDermott intervened in this action seeking recovery for the worker's compensation benefits paid to Walker. After trial on the merits, special interrogatories were submitted to the jury. The jury found that Walker was *260 injured in the accident. It attributed no fault to Babcock, 60% fault to McDermott, and 40% fault to Walker. From this verdict in favor of Babcock, plaintiffs appeal and raise the following issues for review: (1) whether the trial court erred in charging the jury in accordance with the Products Liability Act (La.R.S. 9:2800.51 et seq.); (2) whether the issue of McDermott's negligence should have been submitted to the jury; (3) whether the trial court properly charged the jury on the standards applicable to McDermott; and (4) whether the issue of Walker's negligence should have been submitted to the jury.
McDermott appealed, alleging as error the retroactive application of the Louisiana Products Liability Act; the submission to the jury of the issues of fault on the parts of Walker and McDermott; and the failure to properly charge the jury regarding the standard of negligence applicable to McDermott.

APPLICATION OF THE LOUISIANA PRODUCTS LIABILITY ACT
The jury instructions regarding products liability tracked the language of the Louisiana Products Liability Act. Appellants contend that this constitutes reversible error.
The effective date of the Louisiana Products Liability Act (LPLA), La.R.S. 9:2800.51-2800.59, is September 1, 1988. It contains no language indicating the intent to give it retroactive effect. The accident occurred on January 26, 1988, and this action was instituted on May 16, 1988. If the LPLA is substantive in nature, it should not be applied retrospectively and the jury charge to the contrary would constitute error.
The LPLA establishes the "exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. 9:2800.52. Manufacturers are liable to claimants damaged by an "unreasonably dangerous" product. La.R.S. 9:2800.54(A). The LPLA sets forth the exclusive definitions or theories by which a product can be deemed "unreasonably dangerous." La. R.S. 9:2800.54-2800.58. Thus, a product which was found to be "defective" under the pre-LPLA jurisprudence must fit within the "unreasonably dangerous" categories prescribed in the LPLA in order to obtain recovery under the Act. The "unreasonably dangerous per se" theory of products liability enunciated in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La. 1986), has been excluded as an available theory of liability under the LPLA.
The damage caused by the product must arise from the "reasonably anticipated use" of the product. La.R.S. 9:2800.54. That term is defined in La.R.S. 9:2800.53(7) as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." The LPLA definition is narrower in scope than the term "normal use" of the product which has been defined to encompass "all reasonably foreseeable uses and misuses of the product," Bloxom v. Bloxom, 512 So.2d 839, 841 (La.1987), in pre-LPLA jurisprudence. Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565 (1989).
A reading of the LPLA leads us to conclude that the LPLA affects substantive rights and must be applied prospectively. See Berry v. Commercial Union Insurance Co., 565 So.2d 487 (La.App. 2d Cir.), writ denied, 569 So.2d 959 (La.1990); Breeden v. Valencia, Inc., 557 So.2d 302 (La.App. 4th Cir.), writ denied, 558 So.2d 607 (La.1990). Because we have determined that the LPLA is to be applied prospectively, we must determine whether the jury instructions tracking the language of the LPLA constitute reversible error. In order to determine whether an erroneous jury instruction constitutes reversible error, the reviewing court must compare the degree of error with the instructions as a whole and with the circumstances of the case. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3d Cir. 1985), writs denied, 480 So.2d 738 (La. 1986). When the reviewing court finds that an erroneous jury instruction "probably contributed to the verdict, the verdict *261 must be set aside on appeal.... This procedure in effect prohibits the reviewing court's use of the manifest error rule when the jury's factual findings favorable to the prevailing party have been tainted." Picou v. Ferrara, 483 So.2d 915, 918 (La. 1986) (citations omitted). The reviewing court may then conduct an independent investigation of the facts from the record. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
Plaintiffs contend that the chain failed because it was defectively manufactured.
Pursuant to La.R.S. 9:2800.55, "[a] product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer."
Given the exclusivity of the causes of action enumerated in the LPLA, coupled with the requirement that the damage arise through the "reasonably anticipated use" of the product [La.R.S. 9:2800.54 and 9:2800.53(7)], which, as discussed below, narrows the scope from the "normal use" of the product of pre-LPLA jurisprudence, we find that the erroneous jury instruction may have affected the jury's factual findings resulting in the jury's attributing no fault to Babcock. Thus, the jury verdict in favor of Babcock must be set aside. Pursuant to Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975), we now proceed to independently examine the facts from the record.
The chain was manufactured by Babcock between June and December of 1976, and there is no record of when the chain was put into service.
Robert T. Bell, a chemical engineer and failure analysis expert, testified on behalf of plaintiffs. He stated that link number five sheered and approximately ten of the remaining links were stretched, leading him to conclude that they were weaker than the remaining links. He stated that the chain links should be uniformly hard or soft; and lack of uniformity indicates there was a defect in the heat treating step of the manufacturing process. Bell had the chain analyzed by Anderson and Associates, a testing laboratory. The hardness readings, microstructure and chemical analyses were within the limits established in the manufacturer's specifications. Bell theorized that although the hardness structure of the stretched links met with the manufacturer's specifications at the time of testing, they had been soft when they left the factory and had hardened due to the stretching and straining at the time of the accident. In Bell's opinion the chain would not have failed at approximately ¼ its load limit of 28,000 pounds unless it was defective. In his words:
It's not as strong as it should be. AndI started looking for what was wrong with it and I never found something I could put my finger on and say, uh-huh, this is the wrong thing. It justI couldn't find that it was misused; I couldn't find that it was damaged; I couldn't find anything about it that explains it to fail, but it failed at a much lower load than it should have. And the hardness of it after failure was approximately what itthe others were, but I know that it got harderit strain-hardened as it failed so that indicates to me that it was softer at the time that it was being used.
Edward Victor Bravenec, Chief Metallurgical Engineer for the firm of Anderson and Associates which operates a metallurgical testing laboratory and is also a consulting metallurgical engineering firm, testified on behalf of Babcock. Bravenec subjected various links of the chain, including link number five to scientific analysis. The microstructure, chemical analysis and hardness levels were found to be within manufacturer's specifications. He stated that improper heat treatment of the chain during the manufacturing process is easy to detect by testing the microstructure and hardness level and the tested links, including number five, did not exhibit such findings. In his opinion, the hardness and microstructure of the chain was the same before and after the accident as when the *262 chain left the factory. He further stated the chain was worn, stretched and abraided by repeated overloads over a period of time. He found link number six was stretched to a diameter below the minimum recommended specifications and this condition preexisted the accident. The weakest link in the chain is the one which will break. Since link number six did not break, in his opinion, the fifth link must have been even narrower in dimension and more severely damaged than the sixth link. He determined that the fifth link was even narrower in dimension than the sixth link by measuring a section of the fractured portion of the fifth link. An additional factor which contributed to the sheering of the fifth link was that the chain was wrapped around the metal plate which resulted in placing a sideload (in contrast to a tensile straight up and down load) on the already worn chain. A sideload reduces the ability of a chain to bear weight. Additionally, the first chain slipped and caused a rapid loading or shock loading effect to the remaining chain which also reduces the weight bearing ability of the chain. Within seconds of the occurrence, the chain sheered. In his opinion the chain should have been taken out of service prior to the date of the accident.
Henry G. Smith, the safety supervisor for McDermott, Inc., stated that it is general company policy that the sling be checked before every use by either the operator, foreman or leaderman. He stated that the chain was not new and that immediately after the accident, he examined the chain and found worn spots.
Arthur Michael Miller, who is employed by McDermott Company as foreman of the Bayou Black and Bayou Boeuf Yards testified that he periodically inspects the slings but keeps no record of such inspections.
Bernard Joseph Ledet, employed by McDermott as a leaderman in the yard, stated that every "couple of weeks" he makes an "eyeball exam" of the chains. He also stated that he does not specifically recall ever inspecting the sling in question.
After considering and weighing all of the facts and evidence in the record, the evidence overwhelmingly leads us to the conclusion that the chain was worn and significantly weakened due to repeated overload prior to the accident. Additional contributing factors to its failure were the sideload and shock load effects to the damaged chain at the time of the accident. Its failure was not a result of a manufacturing defect.
Having found no liability on the part of Babcock, we need not address the remaining assignments of error. We affirm the judgment of the trial court and assess all costs to appellant.
AFFIRMED.