633 So.2d 630 (1993)
LOUISIANA HOME BUILDERS ASSOCIATION SELF-INSURERS' FUND
v.
ADJUSTCO, INC.
No. 92 CA 2280.
Court of Appeal of Louisiana, First Circuit.
December 29, 1993.
Writ Denied March 18, 1994.
*631 Eugene R. Groves, E. Scott Hackenberg, Baton Rouge, for plaintiff-appellee Louisiana Home Builders Ass'n.
William W. Messersmith, III, Joseph L. Spillman, III, New Orleans, for defendant-appellant Adjustco, Inc.
Before WATKINS, SHORTESS and FOGG, JJ.
SHORTESS, Judge.
Louisiana Home Builders Association Self-Insurers' Fund (plaintiff), a group self-insurance fund, brought this suit against Adjustco, Inc. (defendant), the service agent for the fund. Defendant negotiated a reinsurance policy for plaintiff in 1986 which contained a large minimum loss fund (MLF) provision. An MLF is a fixed-dollar amount which must be met before coverage attaches under a reinsurance policy. It is somewhat akin to a deductible in a personal property policy, such as automobile comprehensive or collision insurance. Because of the large MLF in 1986, claims totaling $462,324.00, which plaintiff had thought were covered, were not paid by the reinsurer. Plaintiff contends defendant failed to advise it of the existence of the MLF and the potential unfunded gap in coverage. Plaintiff alleged defendant breached its service contract and was guilty of negligent errors and omissions in failing to advise plaintiff of the MLF. After a seven-day trial, the jury returned a verdict in favor of plaintiff, finding defendant breached its contract. The trial court rendered judgment pursuant to the jury's verdict and awarded plaintiff $462,324.00. Defendant has appealed, assigning seven errors of the trial court. Defendant has also filed an exception of prescription in this court.

JURY INSTRUCTIONS AND INTERROGATORIES
The trial court permitted the jury to answer only two interrogatories: (1) whether "there was a breach of contract by [defendant] in providing reinsurance coverage for" plaintiff; and (2) what amount of damages were sustained by plaintiff. Defendant contends in assignments of error two and three that the trial court erred in permitting the jury to hear testimony on the standard of care required of a broker and giving jury instructions on that standard of care and other negligence issues, but then refusing to permit the jury to answer interrogatories regarding the negligence issues raised by plaintiff and regarding plaintiff's comparative fault.
During the trial, the parties presented testimony of numerous experts on the standards of care required of an insurance broker and an insured. Many, if not most, of the questions asked of the fact witnesses elicited facts concerning whether defendant fell below this standard of care by failing to advise plaintiff the MLF existed and whether plaintiff should have discovered the MLF on its own. In addition to giving instructions on contract law, the trial court instructed the jury that "the broker has a fiduciary duty and responsibility to the insured," that a broker "owes an obligation to his client to use reasonable diligence in attempting to place the insurance requested," that in "the absence of something said or done to mislead the insured ... it is a duty of the insured to inform himself of the provision[s] of the policy," and that under Louisiana Civil Code article 2320 "masters and employers are answerable for the damage occasioned by their employees...." After seven days of testimony and jury instructions sounding in negligence, the jury certainly had confusing signals when it received the verdict form. This conflict in the jury instructions and interrogatories tainted the verdict, entitling it to no weight. So, rather than using the manifest error rule in reviewing the jury's findings, we must resort to our constitutional authority to review facts and make an independent determination of the facts from the record. Picou v. Ferrara, 483 So.2d 915, 918 (La.1986); Walker v. Babcock Indus., 582 So.2d 258, 260-261 (La.App. 1st Cir.1991).
Defendant has complained about several other jury instructions which the trial court declined to give.[1] The trial court's legal *632 error interdicted the jury verdict, but we have treated defendant's assignment of error regarding those instructions during our discussions of the applicable law hereafter.

EVIDENTIARY ISSUES
Defendant alleges the trial court erred in its rulings on several evidentiary matters.

A. Testimony of Bondy and D. Hughes
Defendant contends in assignment of error six that the trial court erred "in requiring Adjustco to call as its own witnesses under direct examination Messrs. Bondy and Hughes...." David J. Bondy, Jr., and Daniel R. Hughes (D. Hughes) were employed by defendant at the time this cause of action arose. At the time of trial, however, they were employed by defendant's competitor. Defendant's complaint seems to be that it should have been allowed to lead these witnesses because they were adverse to it at the time of trial.
Our review of the record reveals that Bondy and D. Hughes testified during plaintiff's case-in-chief, and plaintiff's counsel was allowed to ask them leading questions. When plaintiff's counsel completed his examination of D. Hughes, he noted for the record that defendant was "in effect, now calling this witness on direct out of turn." Defendant's counsel made some sort of "general objection" when plaintiff called Bondy as an adverse witness, but the objection was reported as "unintelligible" by the court reporter. When defendant's counsel began his examination of Bondy, he noted his "opposition to being on direct." However, he made no attempt to show that either Bondy or D. Hughes was an adverse or hostile witness so as to permit him to ask leading questions under Louisiana Code of Evidence article 611(C). We also note both sides had a full opportunity to examine these witnesses and did so. Thus, this assignment of error is without merit.[2]

B. Whitley letter
Defendant contends in assignment of error five that the trial court erred in admitting into evidence a letter written by William T. Whitley, Jr., defendant's employee, to Glinda Long Causey, plaintiff's administrator, dated November 17, 1987. Defendant contends the letter is irrelevant and, if relevant, is more prejudicial than probative.
Defendant filed an exception of prescription, contending that plaintiff was aware of the MLF in October 1986 when it received the policy; that the one-year tort prescription applies; and that plaintiff's suit prescribed in October 1987. Whitley's letter is relevant to the issue of when plaintiff first had knowledge of the MLF and consequent unfunded gap, as Causey testified the letter led to her continued belief that the attachment point (the point at which the reinsurer would begin to pay claims) was strictly a percentage and not a dollar amount.
Defendant also contends plaintiff failed to mitigate its damages by renegotiating the contract during the contract year when it discovered the potential unfunded gap. This letter is relevant to show that even after the contract year was over, defendant was still providing plaintiff with information about the financial condition of the fund which did not mention the gap. This assignment of error is without merit.

FACTUAL REVIEW
Our review of the record reveals the following facts. Plaintiff is a trust established in February 1980 to provide insurance to members of the Louisiana Home Builders Association (LHBA) at a reasonable cost. Charge G. "Bubba" Stoma, executive vice-president of the LHBA, acted as plaintiff's first administrator. In 1981 Stoma hired Causey, an accountant with no insurance experience, as assistant fund administrator. Causey was eventually promoted to administrator.
*633 Plaintiff's trustees are members of the LHBA. Since the trustees' expertise was in building houses and not in insurance, plaintiff hired defendant to provide that expertise. Defendant's employee D. Hughes helped set up the trust and was plaintiff's direct contact with defendant during the early years of the trust. Causey testified that when she began working for plaintiff, defendant "did everything for us with the exception of collecting the premium dollars." She received on-the-job training and instruction from defendant's employees, but she depended on defendant completely for insurance expertise.
The fund was structured as follows: A percentage of premiums paid by its members was placed in a fund to pay claims. When this loss fund was exhausted, plaintiff turned to its reinsurance company, which indemnified plaintiff for claims paid in excess of the fund. The amount of the fund was expressed as a percentage of the earned normal premium (ENP),[3] and from 1980 through 1985 this percentage was the attachment point at which coverage by the reinsurer began.
In 1983 Bondy, another of defendant's employees, became the "on-site coordinator" for plaintiff's account. Bondy reported to D. Hughes, who in turn reported to Forest I. "Buzzy" Hughes (F. Hughes), a senior vice-president with defendant.
Each year plaintiff entered into a contract with defendant wherein defendant agreed to perform various insurance-related services for plaintiff, including negotiating insurance coverage, auditing, and claims adjustment. Under the contract, plaintiff paid defendant a fee based on a percentage of its ENP. The contract document was prepared by defendant and was usually a standardized form prepared by defendant's attorneys. Under defendant's normal procedure, F. Hughes, who had authority to sign the service contract, was supposed to review the contract. The contracts were usually signed before April 1 each year as the fund year ran from April 1 through March 31.
Premium notices had to be sent to members by March 1, so it was important to plaintiff that a firm commitment for insurance be secured before that date, as reinsurance was required by state law. Defendant usually began searching for insurance coverage for plaintiff six months before the beginning of the fund year. On January 5, 1983, defendant presented a written proposal to plaintiff describing renewal coverage available through Safety Mutual Casualty Corporation (Safety) and Mead Reinsurance Corporation. On January 4, 1984, defendant presented a proposal to plaintiff offering two plans available from Safety. Each proposal listed the important policy considerations, including the existence of an MLF and the amount thereof. From those proposals plaintiff selected reinsurance policies from Safety which contained relatively low MLF's.
Causey testified she noticed the term "MLF" in some insurance documents in 1983 and asked Bondy about it. He told her "this really wouldn't come to play" and "there was no reason to worry about it." (654-55) Because the MLF was low in 1983 and 1984, coverage began at the expected attachment point and did not "come to play" in those years. The policy defendant obtained for plaintiff in 1985 from Lloyds of London had no MLF. In 1986, Causey still had no knowledge that an MLF could cause an unfunded gap.
When defendant attempted to obtain insurance coverage for plaintiff for the 1986-87 fund year, it experienced great difficulties. The insurance market was tight, plaintiff had an adverse loss history, and defendant could find no insurers willing even to bid on plaintiff's coverage. Then defendant decided to try something innovative. It offered Safety a chance to recoup some of its 1984 losses if it would write a 1986 policy for plaintiff. The attachment point from 1984 was raised from 70% to 84%, and plaintiff had to "buy back" claims paid by Safety in 1984. This proposal was presented to plaintiff by D. Hughes and Bondy at a special trustees meeting on February 26, 1986, which was much later than usual.
*634 The trustees were very unhappy with this proposal, as it would require using all of their excess funds to buy back the 1984 claims and pay their operating expenses. The meeting lasted all day as they debated the funding problems, and their unhappiness was clearly expressed to D. Hughes and Bondy. Their only options, however, were to accept Safety's offer or to shut down the fund for 1984 and force their members to go to the open market for worker's compensation insurance. They finally voted to accept Safety's offer.
When they voted, however, the trustees lacked a crucial piece of information. The Safety policy contained a combined total MLF for 1984 and 1986 of $5,697,000.00. Bondy testified the information should have been included in the written proposal, but it was not. D. Hughes testified he did not know about the MLF, and there was no discussion about the MLF and its effect during the February 26 meeting. The minutes of the meeting and the testimony of Stoma, Causey, and six of the trustees present at that meeting confirm this.[4] The trustees who testified all stated they would never have accepted Safety's offer had they known of the potential gap in coverage because plaintiff had no funds to cover claims which fell into the gap.
Although plaintiff normally received the service contract and the policy from defendant around the beginning of the fund year, April 1, plaintiff had received neither document for the 1986 fund year by June 17, 1986. Causey wrote to D. Hughes that date requesting the contract and asking that it set forth changes in the contract for the 1986-87 fund year. (P-39 0) Plaintiff received the contract executed by D. Hughes on July 2, 1986. The contract described the insurance just as it had been described in the proposal; it contained no mention of an MLF.
Plaintiff finally received the Safety policy in late October 1986. Bondy testified he received the policy October 21, 1986, from Christine Houldsworth, defendant's Director of Excess. Her cover letter to Bondy stated she and D. Hughes had reviewed the policy and found it to be in order. (P-9) Bondy stated he did not remember if he read the policy and did not recall if he had noticed the MLF. Causey testified that when Bondy brought the policy to her, she did not read it but just put it in the safe.
Plaintiff received from defendant monthly underwriter's reports and various other communications which consistently listed the attachment point as 84%. It was not until 1988, when Safety began to deny claims, that plaintiff learned of the MLF. On April 18, 1988, when year-end audits were completed, (P-11) plaintiff learned its ENP for 1984 and 1986 combined was $6,231,757.00. Its loss fund, based on 84% of the ENP, was $5,234,676.00. Consequently, plaintiff was liable for the unfunded gap of $462,324.00, the difference between the loss fund ($5,234,676.00) and the MLF ($5,697,000.00). (P-39 DD)

EXCEPTION OF PRESCRIPTION
Defendant contends plaintiff's suit is prescribed, relying on the recent Louisiana Supreme Court case of Roger v. Dufrene, 613 So.2d 947 (La.1993). In Roger, the court held than an action against an insurance agent by his client is analogous to a malpractice claim brought against an attorney or a physician. Thus, unless the agent fails to achieve a promised specific result (breaches a warranty) or does nothing at all (commits nonfeasance), a claim against an agent is a delictual action which prescribes one year from the date of the alleged act, omission, or neglect, or within one year from the date the alleged act, omission, or neglect is discovered or should have been discovered.[5] Although the defendant in this case is an insurance *635 broker and not an agent, we believe the Roger analysis applies to brokers as well.
Plaintiff's suit was filed December 13, 1988. The evidence, as set forth above, clearly shows that plaintiff did not learn of defendant's alleged negligent act, the failure to advise plaintiff of the MLF, until April 18, 1988. Defendant contends, however, that plaintiff should have known of the existence of the MLF in October 1986 when it received the Safety policy since the MLF was listed on the declarations page (cover sheet) of the policy.
Douglas K. Schueler was accepted as an expert in the field of insurance with specific interest and experience in self-insured funds. He testified that whether a broker could reasonably expect a client to review its policy depends on the circumstances. He stated it is generally recognized in the industry that self-insurance fund managers do not read their policies. Many hire outside consultants or attorneys to do that for them.
Robert S. Felton testified as an expert in the field of insurance, particularly with regard to self-insured funds. In his opinion, it was unreasonable to expect plaintiff to read its policy. Plaintiff had worked closely with Bondy and D. Hughes for six years and trusted them to tell it if there was a problem with the policy. Felton stated the most he would have expected Causey to do was to check the name on the policy.
F. Hughes, defendant's senior vice president, testified that while he would hope his clients would read their policies themselves, part of the service rendered by defendant was to review policies and make sure they fit their proposals. Since clients paid defendant to review their policies, he stated he would expect the clients to act in accordance with the assurances given by defendant.
Under the particular circumstances of this case, we find plaintiff did not have a duty to read the policy and discover the MLF because plaintiff had a close, trusting relationship with defendant, it relied on defendant for insurance expertise, and it paid defendant for this expertise. Furthermore, even if Causey had noticed the MLF on the declarations page, she had been told by defendant in 1983 not to worry about the MLF, and thus had no reason to suspect the MLF could result in an unfunded gap.
Plaintiff's suit was filed well within one year of the date it first discovered the existence of the MLF and consequent unfunded gap. For these reasons, we overrule defendant's exception of prescription.

LIABILITY
Plaintiff contends defendant negligently failed to inform it of the MLF. F. Hughes testified it was important for defendant to explain to plaintiff the existence of the MLF, the amount, and its effect. He also stated that if there is a change in the policy from one year to the next, it is important to explain the change to the client. He admitted that the presence of an MLF in a policy when there had been no MLF the previous year was a significant change which should be explained to the client.
Schueler testified an MLF is definitely the kind of provision a broker should inform the client of and discuss with the client to be sure it fully understands. The broker should tell the client as soon as he learns of the MLF, certainly before the fund year begins. He stated it was especially important in this case that plaintiff be told of the MLF because of the volatility of the market.
Felton testified a broker should use its best efforts to minimize financial risk to the client. Based on industry standards, defendant should have very carefully explained to plaintiff there was an MLF, the amount, and the effect it would have. This information should have been contained in the proposal and in the service contract.
Defendant contends it used its best efforts to secure insurance for plaintiff and that it was impossible for it to secure a policy for plaintiff which did not contain an MLF. Be that as it may, defendant's fault lies not in securing a policy for plaintiff which contained an MLF, but in failing to inform plaintiff of the MLF. Although Bondy and D. Hughes may not have realized the policy contained an MLF when they first negotiated with Safety, because they held themselves out as insurance experts, they had a duty to find out *636 whether it did. Since it is common knowledge in the insurance industry that all domestic reinsurance policies have MLF's, defendant should have ascertained the amount of the MLF in this policy and communicated that information to plaintiff so it could make an informed decision whether to accept Safety's offer.
We find defendant negligently failed to inform plaintiff of the MLF, thereby failing to use ordinary care and skill in the exercise of its profession of insurance broker. This breach of its duty to use reasonable diligence resulted in damage to plaintiff, i.e., its liability for unfunded claims.

DAMAGES
The amount of the unfunded claims for which plaintiff was liable was stipulated to be $462,324.00. The jury awarded that amount for breach of contract. Whether this case is treated as one in contract or in tort, $462,324.00 remains the amount of damages suffered by plaintiff.
Defendant contends, however, that if plaintiff had noticed the MLF when it received the policy in late October, 1986, it could have negotiated a reduction of the MLF with Safety. Thus, it contends, plaintiff's damages should be reduced. We reject this argument for the same reasons we overrule the exception of prescription. Furthermore, even if plaintiff had discovered the MLF after it received the policy, almost seven months of the policy year had passed. Schueler testified that midterm changes in policies are very difficult to achieve, and in the tight insurance market in 1986, there was "hardly any likelihood" of Safety agreeing to reduce the MLF. Felton testified the chances of such a renegotiation were "zero." The experts agreed that to attempt a renegotiation at that late date would have been "like whistling in the wind." Thus, we find defendant is not entitled to a reduction of plaintiff's damages.

CONCLUSION
For the foregoing reasons, defendant's exception of prescription is overruled. The judgment of the trial court in favor of plaintiff in the sum of $462,324.00 is affirmed. Defendant is cast for all costs.
EXCEPTION OF PRESCRIPTION OVERRULED. JUDGMENT AFFIRMED.
NOTES
[1] Defendant contends in assignment of error three that the trial court failed to instruct the jury properly on the requirements of best efforts contracts, plaintiff's duty to know of the existence of an MLF, impossibility of performance, the adverse presumption regarding missing tape recordings, and mitigation of damages.
[2] We have pretermitted discussion of defendant's assignment of error regarding failure to grant the JNOV because of the interdiction of the jury verdict.
[3] "Earned normal premium" is 85% of the amount of premiums billed, whether collected or not.
[4] Defendant contends it is entitled to a presumption that the MLF was discussed at the meeting because plaintiff was unable to provide a tape recording made of the meeting by Causey. Stoma, Causey, and the trustees testified the tapes were made for Causey's convenience in preparing the minutes after the meetings. There was no official policy regarding the tapes, and many of them were reused or thrown away. Under these circumstances, defendant was not entitled to a presumption regarding the contents of the tapes.
[5] This prescriptive period was codified as Louisiana Revised Statute 9:5606 in 1991, but the statute is inapplicable to this case because the cause of action arose before its effective date.